Justice GORSUCH delivered the opinion of the Court.
The Federal Arbitration Act requires courts to enforce private arbitration agreements. But like most laws, this one bears its qualifications. Among other things, § 1 says that "nothing herein" may be used to compel arbitration in disputes involving the "contracts of employment" of certain transportation workers. 9 U.S.C. § 1. And that qualification has sparked these questions: When a contract delegates questions of arbitrability to an arbitrator, must a court leave disputes over the application of § 1's exception for the arbitrator to resolve? And does the term "contracts of employment" refer only to contracts between employers and employees, or does it also reach contracts with independent contractors? Because courts across the country have disagreed on the answers to these questions, we took this case to resolve them.
I
New Prime is an interstate trucking company and Dominic Oliveira works as one of its drivers. But, at least on paper, Mr. Oliveira isn't an employee; the parties' contracts label him an independent contractor. Those agreements also instruct that any disputes arising out of the parties' relationship should be resolved by an arbitrator-even disputes over the scope of the arbitrator's authority.
Eventually, of course, a dispute did arise. In a class action lawsuit in federal court, Mr. Oliveira argued that New Prime denies its drivers lawful wages. The company may call its drivers independent contractors. But, Mr. Oliveira alleged, in reality New Prime treats them as employees and fails to pay the statutorily due minimum wage. In response to Mr. Oliveira's complaint, New Prime asked the court to invoke its statutory authority under the Act and compel arbitration according to the terms found in the parties' agreements.
That request led to more than a little litigation of its own. Even when the parties' contracts mandate arbitration, Mr. Oliveira observed, the Act doesn't always authorize a court to enter an order compelling it. In particular, § 1 carves out from the Act's coverage "contracts of employment of ... workers engaged in foreign or interstate commerce." And at least for purposes of this collateral dispute, Mr. Oliveira submitted, it doesn't matter whether you view him as an employee or independent contractor. Either way, his agreement to drive trucks for New Prime qualifies as a "contract[ ] of employment of ... [a] worker[ ] engaged in ... interstate commerce." Accordingly, Mr. Oliveira argued, the Act supplied the district court with no authority to compel arbitration in this case.
*537 Naturally, New Prime disagreed. Given the extraordinary breadth of the parties' arbitration agreement, the company insisted that any question about § 1's application belonged for the arbitrator alone to resolve. Alternatively and assuming a court could address the question, New Prime contended that the term "contracts of employment" refers only to contracts that establish an employer-employee relationship. And because Mr. Oliveira is, in fact as well as form, an independent contractor, the company argued, § 1's exception doesn't apply; the rest of the statute does; and the district court was (once again) required to order arbitration.
Ultimately, the district court and the First Circuit sided with Mr. Oliveira. 857 F.3d 7 (2017). The court of appeals held, first, that in disputes like this a court should resolve whether the parties' contract falls within the Act's ambit or § 1's exclusion before invoking the statute's authority to order arbitration. Second, the court of appeals held that § 1' s exclusion of certain "contracts of employment" removes from the Act's coverage not only employer-employee contracts but also contracts involving independent contractors. So under any account of the parties' agreement in this case, the court held, it lacked authority under the Act to order arbitration.
II
In approaching the first question for ourselves, one thing becomes clear immediately. While a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional. If two parties agree to arbitrate future disputes between them and one side later seeks to evade the deal, §§ 3 and 4 of the Act often require a court to stay litigation and compel arbitration "accord[ing to] the terms" of the parties' agreement. But this authority doesn't extend to all private contracts, no matter how emphatically they may express a preference for arbitration.
Instead, antecedent statutory provisions limit the scope of the court's powers under §§ 3 and 4. Section 2 provides that the Act applies only when the parties' agreement to arbitrate is set forth as a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce." And § 1 helps define § 2's terms. Most relevant for our purposes, § 1 warns that "nothing" in the Act "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Why this very particular qualification? By the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers. And it seems Congress "did not wish to unsettle" those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate. Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 121, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001).
Given the statute's terms and sequencing, we agree with the First Circuit that a court should decide for itself whether § 1's "contracts of employment" exclusion applies before ordering arbitration. After all, to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2. The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a *538 court to stay litigation and send the parties to an arbitral forum.
Nothing in our holding on this score should come as a surprise. We've long stressed the significance of the statute's sequencing. In Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 201-202, 76 S.Ct. 273, 100 L.Ed. 199 (1956), we recognized that " Sections 1, 2, and 3 [and 4] are integral parts of a whole.... [Sections] 1 and 2 define the field in which Congress was legislating," and §§ 3 and 4 apply only to contracts covered by those provisions. In Circuit City, we acknowledged that " Section 1 exempts from the [Act] ... contracts of employment of transportation workers." 532 U.S., at 119, 121 S.Ct. 1302. And in Southland Corp. v. Keating, 465 U.S. 1, 10-11, and n. 5, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), we noted that "the enforceability of arbitration provisions" under §§ 3 and 4 depends on whether those provisions are "part of a written maritime contract or a contract 'evidencing a transaction involving commerce' " under § 2 -which, in turn, depends on the application of § 1's exception for certain "contracts of employment."
To be sure, New Prime resists this straightforward understanding. The company argues that an arbitrator should resolve any dispute over § 1's application because of the "delegation clause" in the parties' contract and what is sometimes called the "severability principle." A delegation clause gives an arbitrator authority to decide even the initial question whether the parties' dispute is subject to arbitration. Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 68-69, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). And under the severability principle, we treat a challenge to the validity of an arbitration agreement (or a delegation clause) separately from a challenge to the validity of the entire contract in which it appears. Id., at 70-71, 130 S.Ct. 2772. Unless a party specifically challenges the validity of the agreement to arbitrate, both sides may be required to take all their disputes-including disputes about the validity of their broader contract-to arbitration. Ibid. Applying these principles to this case, New Prime notes that Mr. Oliveira has not specifically challenged the parties' delegation clause and submits that any controversy should therefore proceed only and immediately before an arbitrator.
But all this overlooks the necessarily antecedent statutory inquiry we've just discussed. A delegation clause is merely a specialized type of arbitration agreement, and the Act "operates on this additional arbitration agreement just as it does on any other." Id., at 70, 130 S.Ct. 2772. So a court may use §§ 3 and 4 to enforce a delegation clause only if the clause appears in a "written provision in ... a contract evidencing a transaction involving commerce" consistent with § 2. And only if the contract in which the clause appears doesn't trigger § 1's "contracts of employment" exception. In exactly the same way, the Act's severability principle applies only if the parties' arbitration agreement appears in a contract that falls within the field §§ 1 and 2 describe. We acknowledged as much some time ago, explaining that, before invoking the severability principle, a court should "determine[ ] that the contract in question is within the coverage of the Arbitration Act." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).
III
That takes us to the second question: Did the First Circuit correctly resolve the merits of the § 1 challenge in this case? Recall that § 1 excludes from the Act's compass "contracts of employment *539 of ... workers engaged in ... interstate commerce." Happily, everyone before us agrees that Mr. Oliveira qualifies as a "worker[ ] engaged in ... interstate commerce." For purposes of this appeal, too, Mr. Oliveira is willing to assume (but not grant) that his contracts with New Prime establish only an independent contractor relationship.
With that, the disputed question comes into clear view: What does the term "contracts of employment" mean? If it refers only to contracts that reflect an employer-employee relationship, then § 1's exception is irrelevant and a court is free to order arbitration, just as New Prime urges. But if the term also encompasses contracts that require an independent contractor to perform work, then the exception takes hold and a court lacks authority under the Act to order arbitration, exactly as Mr. Oliveira argues.
A
In taking up this question, we bear an important caution in mind. "[I]t's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary ... meaning ... at the time Congress enacted the statute.' " Wisconsin Central Ltd. v. United States, 585 U.S. ----, ----, 138 S.Ct. 2067, 2074, 201 L.Ed.2d 490 (2018) (quoting Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ). See also Sandifer v. United States Steel Corp., 571 U.S. 220, 227, 134 S.Ct. 870, 187 L.Ed.2d 729 (2014). After all, if judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the "single, finely wrought and exhaustively considered, procedure" the Constitution commands. INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). We would risk, too, upsetting reliance interests in the settled meaning of a statute. Cf. 2B N. Singer & J. Singer, Sutherland on Statutes and Statutory Construction § 56A:3 (rev. 7th ed. 2012). Of course, statutes may sometimes refer to an external source of law and fairly warn readers that they must abide that external source of law, later amendments and modifications included. Id ., § 51:8 (discussing the reference canon). But nothing like that exists here. Nor has anyone suggested any other appropriate reason that might allow us to depart from the original meaning of the statute at hand.
That, we think, holds the key to the case. To many lawyerly ears today, the term "contracts of employment" might call to mind only agreements between employers and employees (or what the common law sometimes called masters and servants). Suggestively, at least one recently published law dictionary defines the word "employment" to mean "the relationship between master and servant." Black's Law Dictionary 641 (10th ed. 2014). But this modern intuition isn't easily squared with evidence of the term's meaning at the time of the Act's adoption in 1925. At that time, a "contract of employment" usually meant nothing more than an agreement to perform work. As a result, most people then would have understood § 1 to exclude not only agreements between employers and employees but also agreements that require independent contractors to perform work.
What's the evidence to support this conclusion? It turns out that in 1925 the term "contract of employment" wasn't defined in any of the (many) popular or legal dictionaries the parties cite to us. And surely that's a first hint the phrase wasn't then a term of art bearing some specialized meaning. It turns out, too, that the dictionaries of the era consistently afforded the word "employment" a broad construction, broader than may be often found in dictionaries today. Back then, dictionaries tended to *540 treat "employment" more or less as a synonym for "work." Nor did they distinguish between different kinds of work or workers: All work was treated as employment, whether or not the common law criteria for a master-servant relationship happened to be satisfied.[1]
What the dictionaries suggest, legal authorities confirm. This Court's early 20th-century cases used the phrase "contract of employment" to describe work agreements involving independent contractors.[2] Many state court cases did the same.[3] So did a variety of federal statutes.[4] And state statutes too.[5] We see here no evidence that a "contract of employment" necessarily signaled a formal employer-employee or master-servant relationship.
More confirmation yet comes from a neighboring term in the statutory text.
*541 Recall that the Act excludes from its coverage "contracts of employment of ... any ... class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 (emphasis added). Notice Congress didn't use the word "employees" or "servants," the natural choices if the term "contracts of employment" addressed them alone. Instead, Congress spoke of "workers," a term that everyone agrees easily embraces independent contractors. That word choice may not mean everything, but it does supply further evidence still that Congress used the term "contracts of employment" in a broad sense to capture any contract for the performance of work by workers .
B
What does New Prime have to say about the case building against it? Mainly, it seeks to shift the debate from the term "contracts of employment" to the word "employee." Today, the company emphasizes, the law often distinguishes between employees and independent contractors. Employees are generally understood as those who work "in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary, at 639. Meanwhile, independent contractors are sometimes described as those "entrusted to undertake a specific project but who [are] left free to do the assigned work and to choose the method for accomplishing it." Id., at 888. New Prime argues that, by 1925, the words "employee" and "independent contractor" had already assumed these distinct meanings.[6] And given that, the company contends, the phrase "contracts of employment " should be understood to refer only to relationships between employers and employees .
Unsurprisingly, Mr. Oliveira disagrees. He replies that, while the term "employment" dates back many centuries, the word "employee" only made its first appearance in English in the 1800s. See Oxford English Dictionary (3d ed., Mar. 2014), www.oed.com/view/Entry/61374 (all Internet materials as last visited Jan. 9, 2019). At that time, the word from which it derived, "employ," simply meant to "apply (a thing) to some definite purpose." 3 J. Murray, A New English Dictionary on Historical Principles 129 (1891). And even in 1910, Black's Law Dictionary reported that the term "employee" had only "become somewhat naturalized in our language." Black's Law Dictionary 421 (2d ed. 1910).
Still, the parties do share some common ground. They agree that the word "employee" eventually came into wide circulation and came to denote those who work for a wage at the direction of another. They agree, too, that all this came to pass in part because the word "employee" didn't suffer from the same "historical baggage" of the older common law term "servant," and because it proved useful when drafting legislation to regulate burgeoning industries and their labor forces in the early 20th century.[7] The parties even agree *542 that the development of the term "employee" may have come to influence and narrow our understanding of the word "employment" in comparatively recent years and may be why today it might signify to some a "relationship between master and servant."[8]
But if the parties' extended etymological debate persuades us of anything, it is that care is called for. The words "employee" and "employment" may share a common root and an intertwined history. But they also developed at different times and in at least some different ways. The only question in this case concerns the meaning of the term "contracts of employment " in 1925. And, whatever the word "employee" may have meant at that time, and however it may have later influenced the meaning of "employment," the evidence before us remains that, as dominantly understood in 1925, a contract of employment did not necessarily imply the existence of an employer-employee or master-servant relationship.
When New Prime finally turns its attention to the term in dispute, it directs us to Coppage v. Kansas, 236 U.S. 1, 13, 35 S.Ct. 240, 59 L.Ed. 441 (1915). There and in other cases like it, New Prime notes, courts sometimes used the phrase "contracts of employment" to describe what today we'd recognize as agreements between employers and employees. But this proves little. No one doubts that employer-employee agreements to perform work qualified as "contracts of employment" in 1925-and documenting that fact does nothing to negate the possibility that "contracts of employment" also embraced agreements by independent contractors to perform work. Coming a bit closer to the mark, New Prime eventually cites a handful of early 20th-century legal materials that seem to use the term "contracts of employment" to refer exclusively to employer-employee agreements.[9] But from the record amassed before us, these authorities appear to represent at most the vanguard, not the main body, of contemporaneous usage.
New Prime's effort to explain away the statute's suggestive use of the term "worker" proves no more compelling. The company reminds us that the statute excludes "contracts of employment" for "seamen" and "railroad employees" as well as other transportation workers. And because "seamen" and "railroad employees" included only employees in 1925, the company reasons, we should understand "any other class of workers engaged in ... interstate commerce" to bear a similar construction. But this argument rests on a precarious premise. At the time of the Act's passage, *543 shipboard surgeons who tended injured sailors were considered "seamen" though they likely served in an independent contractor capacity.[10] Even the term "railroad employees" may have swept more broadly at the time of the Act's passage than might seem obvious today. In 1922, for example, the Railroad Labor Board interpreted the word "employee" in the Transportation Act of 1920 to refer to anyone "engaged in the customary work directly contributory to the operation of the railroads."[11] And the Erdman Act, a statute enacted to address disruptive railroad strikes at the end of the 19th century, seems to evince an equally broad understanding of "railroad employees."[12]
Unable to squeeze more from the statute's text, New Prime is left to appeal to its policy. This Court has said that Congress adopted the Arbitration Act in an effort to counteract judicial hostility to arbitration and establish "a liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). To abide that policy, New Prime suggests, we must order arbitration according to the terms of the parties' agreement. But often and by design it is "hard-fought compromise[ ]," not cold logic, that supplies the solvent needed for a bill to survive the legislative process. Board of Governors, FRS v. Dimension Financial Corp., 474 U.S. 361, 374, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). If courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to "tak[e] ... account of" legislative compromises essential to a law's passage and, in that way, thwart rather than honor "the effectuation of congressional intent." Ibid. By respecting the qualifications of § 1 today, we "respect the limits up to which Congress was prepared" to go when adopting the Arbitration Act. United States v. Sisson, 399 U.S. 267, 298, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970).
Finally, and stretching in a different direction entirely, New Prime invites us to look beyond the Act. Even if the statute doesn't supply judges with the power to compel arbitration in this case, the company says we should order it anyway because courts always enjoy the inherent authority to stay litigation in favor of an alternative dispute resolution mechanism of the parties' choosing. That, though, is an argument we decline to tangle with. The courts below did not address it and we granted certiorari only to resolve existing confusion about the application of the Arbitration Act, not to explore other potential avenues for reaching a destination it does not.
*
When Congress enacted the Arbitration Act in 1925, the term "contracts of *544 employment" referred to agreements to perform work. No less than those who came before him, Mr. Oliveira is entitled to the benefit of that same understanding today. Accordingly, his agreement with New Prime falls within § 1's exception, the court of appeals was correct that it lacked authority under the Act to order arbitration, and the judgment is
Affirmed.
Justice KAVANAUGH took no part in the consideration or decision of this case.

See, e.g., 3 J. Murray, A New English Dictionary on Historical Principles 130 (1891) (defining "employment" as, among other things, "[t]he action or process of employing; the state of being employed. The service (of a person). That on which (one) is employed; business; occupation; a special errand or commission. A person's regular occupation or business; a trade or profession"); 3 The Century Dictionary and Cyclopedia 1904 (1914) (defining "employment" as "[w]ork or business of any kind"); W. Harris, Webster's New International Dictionary 718 (1st ed. 1909) (listing "work" as a synonym for "employment"); Webster's Collegiate Dictionary 329 (3d ed. 1916) (same); Black's Law Dictionary 422 (2d ed. 1910) ("an engagement or rendering services" for oneself or another); 3 Oxford English Dictionary 130 (1933) ("[t]hat on which (one) is employed; business; occupation; a special errand or commission").

See, e.g ., Watkins v. Sedberry, 261 U.S. 571, 575, 43 S.Ct. 411, 67 L.Ed. 802 (1923) (agreement between trustee and attorney to recover bankrupt's property); Owen v. Dudley & Michener, 217 U.S. 488, 494, 30 S.Ct. 602, 54 L.Ed. 851 (1910) (agreement between Indian tribe and attorneys to pursue claims).

See, e.g ., Lindsay v. McCaslin (Two Cases), 123 Me. 197, 200, 122 A. 412, 413 (1923) ("When the contract of employment has been reduced to writing, the question whether the person employed was an independent contractor or merely a servant is determined by the court as a matter of law"); Tankersley v. Webster, 116 Okla. 208, 210, 243 P. 745, 747 (1925) ("[T]he contract of employment between Tankersley and Casey was admitted in evidence without objections, and we think conclusively shows that Casey was an independent contractor"); Waldron v. Garland Pocahontas Coal Co., 89 W.Va. 426, 427, 109 S.E. 729 (1921) (syllabus) ( "Whether a person performing work for another is an independent contractor depends upon a consideration of the contract of employment, the nature of the business, the circumstances under which the contract was made and the work was done"); see also App. to Brief for Respondent 1a-12a (citing additional examples).

See, e.g., Act of Mar. 19, 1924, ch. 70, § 5, 43 Stat. 28 (limiting payment of fees to attorneys "employed" by the Cherokee Tribe to litigate claims against the United States to those "stipulated in the contract of employment"); Act of June 7, 1924, ch. 300, §§ 2, 5, 43 Stat. 537 -538 (providing same for Choctaw and Chickasaw Tribes); Act of Aug. 24, 1921, ch. 89, 42 Stat. 192 (providing that no funds may be used to compensate "any attorney, regular or special, for the United States Shipping Board or the United States Shipping Board Emergency Fleet Corporation unless the contract of employment has been approved by the Attorney General of the United States"). See also App. to Brief for Respondent 13a (citing additional examples).

See, e.g., Act of Mar. 10, 1909, ch. 70, § 1, 1909 Kan. Sess. Laws p. 121 (referring to "contracts of employment of auditors, accountants, engineers, attorneys, counselors and architects for any special purpose"); Act of Mar. 4, 1909, ch. 4, § 4, 1909 Okla. Sess. Laws p. 118 ("Should the amount of the attorney's fee be agreed upon in the contract of employment, then such attorney's lien and cause of action against such adverse party shall be for the amount so agreed upon"); Act of Mar. 4, 1924, ch. 88, § 1, 1924 Va. Acts ch. 91 (allowing extension of "contracts of employment" between the state and contractors with respect to the labor of prisoners); App. to Brief for Respondent 14a-15a (citing additional examples).

See, e.g., Atlantic Transp. Co. v. Coneys, 82 F. 177, 178 (C.A.2 1897) ; Nyback v. Champagne Lumber Co., 109 F. 732, 741 (C.A.7 1901).

See Carlson, Why the Law Still Can't Tell an Employee When It Sees One and How It Ought To Stop Trying, 22 Berkeley J. Emp. & Lab. L. 295, 309 (2001) (discussing the "historical baggage" of the term "servant"); Broden, General Rules Determining the Employment Relationship Under Social Security Laws: After Twenty Years an Unsolved Problem, 33 Temp. L.Q. 307, 327 (1960) (describing use of the term "employer-employee," in contradistinction to "master-servant," in the Social Security laws). Legislators searched to find a term that fully encompassed the broad protections they sought to provide and considered an "assortment of vague and uncertain terms," including " 'servant,' ... 'employee,' ... 'workman,' 'laborer,' 'wage earner,' 'operative,' or 'hireling.' " Carlson, 22 Berkeley J. Emp. & Lab. L., at 308. Eventually " 'employee' prevailed, if only by default, and the choice was confirmed by the next wave of protective legislation-workers' compensation laws in the early years of the Twentieth Century." Id., at 309.

Black's Law Dictionary 641 (10th ed. 2014); see also P. Durkin, Release Notes: The Changes in Empathy, Employ, and Empire (Mar. 13, 2014) ("Over time" the meaning of several employ-related words have "reflect[ed] changes in the world of work" and their meaning "shows an increasingly marked narrowing"), online at https://public.oed.com/blog/march-2014-update-release-notes/.

See, e.g., 1 T. Conyngton, Business Law: A Working Manual of Every-day Law 302-303 (2d ed. 1920); Newland v. Bear, 218 App.Div. 308, 309, 218 N.Y.S. 81, 81-82 (1926) ; Anderson v. State Indus. Accident Comm'n, 107 Ore. 304, 311-312, 215 P. 582, 583, 585 (1923) ; N. Dosker, Manual of Compensation Law: State and Federal 8 (1917).

See, e.g., The Sea Lark, 14 F.2d 201 (W.D.Wash.1926) ; The Buena Ventura, 243 F. 797, 799 (S.D.N.Y.1916) ; Holt v. Cummings, 102 Pa. 212, 215 (1883) ; Allan v. State S.S. Co., 132 N.Y. 91, 99, 30 N.E. 482, 485 (1892) ("The work which the physician does after the vessel starts on the voyage is his and not the ship owner's").

Transportation Act of 1920, §§ 304, 307, 41 Stat. 456 ; Railway Employees' Dept., A.F. of L. v. Indiana Harbor Belt R. Co ., Decision No. 982, 3 R.L.B. 332, 337 (1922).

The Act provided for arbitration between railroads and workers, and defined "employees" as "all persons actually engaged in any capacity in train operation or train service of any description." Act of June 1, 1898, ch. 370, 30 Stat. 424. The Act also specified that the railroads would "be responsible for the acts and defaults of such employees in the same manner and to the same extent as if ... said employees [were] directly employed by it." Id., at 425. See Dempsey, Transportation: A Legal History, 30 Transp. L.J. 235, 273 (2003).